USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/19/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -v.-

AKEEM KRUBALLY,

              Defendant.

20 cr 616 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

    Defendant Akeem Krubally ("Defendant") was charged by Complaint on August 24, 2020, with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (ECF No. 2.) On January 14, 2021, Defendant filed a motion to dismiss, suppress evidence, and for a hearing. (ECF No. 20.) On February 25, 2021, the Court issued an opinion granting Defendant's motion for a hearing. (ECF No. 26.) The Court held a suppression hearing on April 20, 2021 and the Court permitted the parties to submit supplemental briefs on the issues of suppression and dismissal. (ECF Nos. 32 & 32.) For the following reasons, Defendant's motion to dismiss and/or suppress is DENIED.

## BACKGROUND

    During the suppression hearing, the Court heard testimony from four witnesses—Officer Nicholas Scimia ("Scimia"), Officer Tariq Hylton ("Hylton", together with Scimia, the "Officers"), Vanessa Coke ("Coke"), and Amber Steppe ("Steppe")—and observed surveillance footage, photographs, and physical evidence. The following facts are drawn from the evidence presented and are undisputed, unless otherwise indicated.

At approximately 10:00 P.M., on August 21, 2020, Defendant, Coke, and Steppe, were sitting in an idling Jeep[1] ("the Jeep") parked on the right side of Millington Street, near South Columbus Avenue in Mount Vernon, New York. (Tr. 9:7-9; Tr. 13:9-14; Tr. 76:10-11; Tr. 133.) Coke was in the driver's seat, Steppe was in the front passenger seat, and Defendant was in the rear seat, on the driver's side. (Tr. 79:14-20; Tr. 116:16-117:1.) Scimia testified that he believed the Jeep model had tinted rear windows and that Scimia told FBI Agent Sacco one month after the incident that the Jeep had tinted rear windows. (Tr. 62.) Coke testified that she did not believe the Jeep had tinted windows and that it was not very dark. (Tr. 120:4-6.) Steppe testified that she did not know if the Jeep windows were tinted. (Tr. 135:6-7.) Other occupied parked cars were located nearby on South Columbus Avenue. (Tr. 51:19-21.)

The Officers, both Mount Vernon Police Officers, were patrolling the area in an unmarked police vehicle. (Tr. 8:15-16; 9:21-23; 74:7-8; 75:19-4.) Scimia testified that the Officers "were just patrolling quality of life issues" like "[g]ambling, smoking, drinking, in public" and that the area was a "very high-crime" residential area known for "a lot of narcotic activity, gambling, et cetera." (Tr. 8:14-18; Tr. 12:4-22.) Scimia testified that he believed that in April 2020 a shooting occurred near the corner of South Columbus Avenue and Millington Street as the result of a gambling argument. (Tr. 12:23-12:4.) Hylton also testified that "there's a lot of drug sales in that area, and there was also a homicide on that very corner just a couple months before." (Tr. 76:22-24.)

The Officers were in plain clothes, wearing vests that said "Police" and had police shields around their necks. (Tr. 9:15-20; 17:16-21; Tr. 134:19-135:3.) Scimia was in the driver's seat and Hylton was in the front passenger seat. (Tr. 8:25-9:3; 76:5-6.) Scimia drove down South

---

[1] Coke testified that the Jeep was running because it was a very hot August evening and she had the air conditioner running. (Tr. 119:22-120:3).

Columbus Avenue and turned right onto Millington Street, driving slightly past the Jeep, which was parked to the right of the police vehicle. (Tr. 13; Tr. 17:2-3.) The Officers testified that as Scimia drove past the Jeep they saw the rear window cracked, saw smoke, and smelled marijuana. (Tr. 44:11-12; Tr. 55:11-16; Tr. 77.) Coke and Steppe both testified that none of the occupants of the vehicle were smoking marijuana or cigarettes that night. (Tr. 118:17-119:4; Tr. 120:15-17; Tr. 135:11-136:4.)

Scimia then backed the police vehicle up so that it was aligned with the Jeep. Defendant's window was cracked open approximately 3 to 4 inches. (Tr. 13:9-14; Tr. 57:3-5; Tr: 58:21-22; Tr. 77.) Defendant rolled down his window and said to the Officers something to the effect of "yo, y'all good?" or "what's good?" (Tr. 13:17-14:1; 57:12-14; Tr. 117:13-18.) Scimia testified that Defendant's words were "very confrontational," as if "he was trying to fight or something." (Tr. 14:2-5.) Hylton testified that it was "kind of like a threatening statement to me." (Tr. 78:4-5.) Scimia also testified that he observed Defendant reach forward to the front seat and it "appeared like he was grabbing something from the front passenger seat or some kind of exchange was given." (Tr. 15:17-21.) Hylton testified that he observed Defendant make a movement that appeared like he was reaching for something. (Tr. 78:6-11.)

Scimia began to exit the police vehicle to investigate the marijuana, but then decided to get back into the car and pull the police vehicle forward, blocking the front of the Jeep. (Tr. 17:3-7; Tr. 59:9-18; Tr. 117:13-20.) Hylton testified that the movement he observed made him tell Scimia to move the vehicle to the front. (Tr. 78:9-11.) Hylton testified that Defendant's statement, along with the reaching motion, made Hylton feel like the Officers were not safe being parallel to the Jeep. (Tr. 80:2-4; 92:1-3.) Scimia testified that his intent in driving forward was to the block the Jeep in. (Tr. 49:11-12.) The Officers then exited the police vehicle. (Tr. 17.)

3

Scimia testified that he does not recall whether he identified himself as a police officer upon exiting the vehicle. (Tr. 18:4-6.) Hylton testified that he did not identify himself as a police officer upon exiting the vehicle. (Tr. 80.) Steppe testified that she was aware Scimia and Hylton were police officers when they exited the car because she saw their badges. (Tr. 134.) Defendant immediately exited the Jeep. (Tr. 18:7-10; Tr. 118; Tr. 136.) Scimia testified that Defendant had a black bag around his neck, across his stomach and chest area, and that Defendant "kind of almost looked like he had just put it on" but that Scimia "can't confirm if he did or not" and that Defendant was holding it "very tight to his chest." (Tr. 18.) Hylton testified that Defendant was wearing a satchel across his chest and that there was nothing out of the ordinary about the satchel. (Tr. 101.) Scimia and Hylton testified that they then told Defendant multiple times to get back into the Jeep, but Defendant instead began to walk away. (Tr. 19; Tr. 102.) Scimia testified that as Defendant walked away, he kept looking back and may have even asked "Why, why?" (Tr. 19.) As Defendant continued to walk away, Scimia continued to call after Defendant to stop and Hylton indicated over radio that the Officers were about to be in foot pursuit because, according to Scimia, "it just appeared like [Defendant] was about to run." (Tr. 20.)

Scimia testified that he began walking towards Defendant. (Tr. 20.) Scimia also testified that Defendant began running and Scimia started running after him. (Tr. 20.) Hylton testified that the Officers both "moved towards" Defendant and that Defendant began to run, at which point Scimia "was in pursuit of [Defendant]" while Hylton stayed with the Jeep. (Tr. 82.) Coke and Steppe testified that the Officers chased Defendant and then Defendant ran away. (Tr. 118:10-12; Tr. 136:21-22.) Scimia testified that his intent was to detain Defendant. (Tr. 60:5-6.) When Scimia caught up with Defendant, he pushed Defendant to the ground and attempted to place Defendant in handcuffs. (Tr. 21.) Defendant struggled and, during the struggle, a firearm fell out

of Defendant's bag. (Tr. 21.) Scimia testified that he then began yelling "gun, gun, gun" and made the decision to secure the gun and let Defendant go. (Tr. 22.) Hylton ran to Scimia and secured the gun. (Tr. 22.) Scimia then continued pursuit of Defendant, but lost sight of Defendant. (Tr. 22.)

After losing sight of Defendant, approximately ten to fifteen police officers canvassed the area for approximately one hour looking for him. (Tr. 23.) The officers were unable to find Defendant, but found the bag abandoned in the direction Defendant ran in. (Tr. 23-24.) The bag contained various items including Defendant's New York State ID. (Tr. 36.) Following the canvas of the area, the Officers returned to their police vehicle and found that the Jeep had left. (Tr. 27.) Coke and Steppe testified that after the Officers ran after Defendant, Coke reversed the Jeep and drove away. (Tr. 118; Tr. 136-137.)

On September 21, 2020, Hylton was interviewed by FBI Agent Sacco regarding the incident. (Tr. 103-104.) Although Hylton believes he mentioned marijuana when he described the incident to Agent Sacco, Agent Sacco's notes of the incident do not include any mention of marijuana. (*Id.*)

## STANDARD

To defeat a suppression motion, "[t]he Government bears the burden of proof." *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008). The Government must make this showing "by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## DISCUSSION

The Fourth Amendment to the United States Constitution protects citizens' "persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), "a police officer may briefly detain an individual for questioning if the officer has 'a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.'" *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)). An officer has a reasonable suspicion when he or she is "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). Courts "'look at the totality of the circumstances' in order to determine 'whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Freeman*, 735 F.3d 92, 101 (2d Cir. 2013) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "[T]he amount of suspicion needed to justify the encounter is less than a 'fair probability' of wrongdoing, and 'considerably less than proof of wrongdoing by a preponderance of evidence.'" *Padilla*, 548 F.3d at 186-87 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "Moreover, such a stop must be 'justified at its inception.' Any events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) (quoting *Terry*, 392 U.S. at 20).[2]

## I. Seizure of Defendant

In order to determine whether the seizure of Defendant was justified by reasonable suspicion, the Court must first determine when Defendant was seized. Defendant argues that he

---

[2] Defense Counsel argued at the hearing that by attempting to handcuff Defendant, Scimia was attempting an arrest, which required probable cause and not reasonable suspicion. In this case, where Defendant refused to submit to the Officers and continued to struggle when Scimia tackled him, placing Defendant in handcuffs would have been entirely reasonable. *See United States v. Fiseku*, 915 F.3d 863, 873 (2d Cir. 2018) (holding placing the defendant in handcuffs during the investigatory stop was reasonable in part because it ensured officer safety). Further, although Scimia attempted to handcuff Defendant, he failed to do so and therefore Defendant's detention could not have conceivably ripened from an investigatory stop to an arrest. *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993) (indicating that an investigatory stop ripens to an arrest when the means of detention are more intrusive than necessary).

was first seized when the Officers attempted to block in the Jeep with their police vehicle. (ECF No. 23 at 4; ECF No. 25 at 4-5), whereas the Government argues that Defendant was first seized when he was tackled by Scimia (ECF No. 23 at 1; ECF No. 35 at 3.)

A person is seized either when physical force is applied to the person or a person submits to law enforcement's assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). Second Circuit precedent indicates that using a police vehicle to effectively block movement of a suspect's vehicle may constitute a seizure of the vehicle's passengers. *See Pane v. Gramaglia*, 509 F. App'x 101, 103 (2d Cir. 2013) ("a reasonable police officer would have known from established precedent that having a fellow officer pull a marked police car with activated turret lights behind Pane's parked car, thereby effectively blocking her movement, and directing the vehicle's spot light toward the interior of Pane's vehicle constituted a seizure that required reasonable suspicion").

However, in this instance, it is clear that the Officers did not effectively block the Jeep's movement because, soon after the incident, Coke backed the Jeep out and drove away. Further, even if the Officers' blocking of the Jeep constituted a seizure of Coke and Steppe—who remained in the blocked Jeep—it certainly did not constitute a seizure of Defendant because Defendant immediately exited the Jeep. *See United States v. Baldwin*, 496 F.3d 215, 218 (2d Cir. 2007) (holding that the defendant was not seized when he pulled over his car in response to a patrol car's overhead lights and sirens where he subsequently fled from the car); *see also Brendlin v. California*, 551 U.S. 249, 255 (2007) ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned.").

After exiting the Jeep, Defendant continued to refuse to submit to the Officers' authority by walking away, ignoring the Officers' instructions to return to the car, and ultimately running away. Therefore, it was not until Scimia applied physical force to Defendant by tackling him that Defendant was seized.

## II. Reasonable Suspicion

The Government argues that, although the Officers' marijuana observations provided Scimia with reasonable suspicion to stop Defendant, even without the marijuana observations,[3] the Officers had reasonable suspicion to stop Defendant. Although it is admittedly a close call, the Court agrees.

In *Illinois v. Wardow*, the Supreme Court held that fleeing from police in a high-crime area may constitute reasonable suspicion. 528 U.S. 119, 125 (2000). In that case, the defendant was standing next to a building and holding an opaque bag in an area known for narcotics trafficking. *Id*. at 121-22. A four-car police caravan converged upon the area and, upon

---

[3] Although the Officers testified that their observations of marijuana were the basis for blocking the front of the Jeep, the Court is not convinced that the Government has met its burden of showing by a preponderance of the evidence that the Officers made such observations. While the Officers testified under oath that they observed smoke and marijuana odors, Coke and Steppe both testified that nobody in the vehicle was smoking marijuana that night. Although Coke and Steppe's friendship with Defendant may influence them to lie for Defendant, Steppe testified that she would not lie for Defendant under oath (Tr. 138.) Additionally, while Steppe and Coke may expose themselves to legal consequences by admitting they were smoking marijuana that night, the legal consequences for smoking marijuana are limited in New York. Further, other factors reduce the credibility of the Officers' testimony. The Jeep was elevated above the Officers' vehicle, it was nighttime at the time of the incident, and the Jeep may have had tinted windows. Hylton sat between Scimia and the Jeep. Nonetheless, Scimia testified that he was able to observe smoke in a very short period of time while driving the police vehicle next to the Jeep. Additionally, when asked under oath if he knew an individual by the name of Israel Roman, Hylton responded: "Uh, don't think so. The name sounds familiar, but I'm not sure." (Tr. 107:19-21.) When later asked whether Roman had a pending lawsuit against Hylton for false arrest, malicious prosecution, and violation of civil rights, Hylton responded: "I haven't heard details about that." (Tr. 107:24-108:2.) *See also* Case No. 21-cv-2214 (civil rights case filed by Israel Roman against Hylton on March 13, 2021). Finally, the fact that Agent Sacco—to whom Hylton later detailed the incident—failed to note anything related to marijuana in his notes about the incident, further undermines the Officers' accounting. Therefore, while Coke and Steppe's relationship with Defendant and fear of admitting to marijuana usage may undermine their credibility, the factors restricting Scimia's ability to observe the Jeep, Hylton's evasiveness, and Agent Sacco's notes similarly undermine the Officers' credibility. As such, it is unclear to the Court that the Government has met its burden in demonstrating by a preponderance of the evidence that the Officers observed marijuana smoke and odors.

observing the officers, the defendant immediately fled. *Id*. The Supreme Court affirmed that an "individual has a right to ignore the police and go about his [or her] business" and that any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Id.* at 125. However, "unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Id*. at 125 (quoting *Florida v. Bostick*, 501 U.S. 429, 427 (1991)). *Wardlow* did not necessarily create a *per se* rule that flight in a high-crime area constitutes reasonable suspicion. *Wardlow*, 528 U.S. at 126–27 (""[t]he Court today wisely endorses neither *per se* rule. Instead, [reasonable suspicion] . . . must be determined by looking to the totality of the circumstances—the whole picture.") (Stevens, J., concurring in part and dissenting in part).

Since *Wardlow*, the Second Circuit has issued several opinions that are instructive in analyzing the circumstances in which flight, coupled with other factors, equates to reasonable suspicion. *See United States v. Bell*, 733 F. App'x 20, 22 (2d Cir. 2018) (finding reasonable suspicion where the defendant "approach[ed] a vehicle illegally stopped in the middle of the road in an area known for narcotics trafficking . . . reached inside of the car and directed the driver to a side road, where the driver exited the vehicle and [the drive and the defendant] appeared to be inspecting something," the defendant walked away from police when they approached, and the defendant fled after a detective ordered him to stop); *United States v. Simmons*, 560 F.3d 98, 108 (2d Cir. 2009) (finding that the combination of a 911 caller's report of an assault in progress, the defendant's hands in his pockets, and the defendant's non-compliance with an order to stop supported the conclusion that officers had reasonable suspicions to stop defendant); *United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir. 2006) (finding that although an anonymous tip lacked sufficient indicia of reliability to justify stop of defendant, the tip coupled with

9

defendant's attempt to flee by increasing the speed of his bicycle, provided a sufficient basis for a finding of reasonable suspicion).

In its earlier opinion, the Court noted that the facts of this case are distinguishable from *Wardlow* because Defendant did not run immediately upon observing law enforcement and Defendant's flight may have been provoked by Scimia and *Muhammed* because there was no anonymous tip. (ECF No. 26.) However, after examining the evidence presented at the hearing, the Court finds Defendant's behavior was nonetheless evasive from the beginning of the interaction and that evasiveness, coupled with Defendant's presence in a high-crime area, the passing of an unknown object, and the tight clutching of a satchel constitutes reasonable suspicion.[4]

Here, the Officers testified that the Jeep was parked in a high-crime area known for narcotic and gambling activity, and that a homicide had recently taken place on the very corner where the Jeep was parked. Although the Officers were in an unmarked police car, their police shields and vests clearly communicated that they were police officers. Steppe testified that, despite the Officers' failure to identify themselves as police officers, it was clear they were police. Upon recognizing the Officers as law enforcement, the Officers observed Defendant pass or receive an unknown object and immediately exit the Jeep, clutching a satchel. Defendant then continued to act in an evasive manner by walking away, ignoring the Officers' orders,[5] and ultimately fleeing. Defendant made movements that signaled he was preparing to run, and,

---

[4] The Government also argues that the statement Defendant made to the Officers ("y'all good?") is a factor that contributes to reasonable suspicion. The Court is not convinced that an individual inquiring "y'all good?" when another car stops alongside his is suspicious under any circumstances and therefore did not consider it in its finding of reasonable suspicion.

[5] The Court notes that even if the Officers' commands for Defendant to stop were unlawful, such a finding of reasonable suspicion is not negated. *United States v. Swindle*, 407 F.3d 562, 568 (2d Cir. 2005).

ultimately, fled.[6] Therefore, much like the facts of *Bell*, Defendant's evasiveness in response to Officers in a high-crime area, following the Officers' observation of an object being passed to Defendant, constitutes reasonable suspicion.

## CONCLUSION

For the foregoing reasons, Defendant's motion to deny and/or suppress is DENIED.

Dated: May 19, 2021                                                          SO ORDERED:

White Plains, New York

_____

NELSON S. ROMÁN

United States District Judge

---

[6] It is unclear from the evidence presented whether Defendant or Scimia ran first. Steppe and Coke testified that Defendant only fled upon being chased by Scimia; Scimia testified that he chased after Defendant after Defendant ran. Scimia is off-screen when Defendant begins to run in the surveillance video. However, given Defendant's persistent evasiveness upon seeing law enforcement and Defendant's body movement indicating that he was preparing to flee, the Court need not conclude whether Defendant or Scimia ran first. Even if flight provoked by Scimia may be less suspicious than unprovoked flight, in light of the circumstances, either flight would be sufficient to support a finding of reasonable suspicion. The Court might be inclined to find otherwise if the evidence presented at the hearing made clear that Defendant was unaware the Officers were law enforcement and or if Defendant were merely going about his business and Scimia initiated chase. However, the circumstances demonstrate that Defendant was preparing the flee as soon as he recognized the Officers as law enforcement and that doing so was the opposite of going about Defendant's business, which would have involved remaining in the car with Coke and Steppe.